Good morning, Illinois Appellate Court, 1st District Court is now in session. The 3rd Division, the Honorable Justice Margaret McBride presiding, case number 22-1625, Continental Casualty Company v. 401 North Wabash Venture. Good morning to the attorneys of record for this appeal. My name again is Margaret McBride. I will be presiding over this appeal with Justices Reyes and Justice Walker. Before we begin, I want to give a general overview of how we're going to proceed. With our Zoom Orals, this division usually allows about 10 minutes of appellant for uninterrupted presentation after which the court and the justices will ask questions. From that 10 minutes, appellant may save out some time for later rebuttal. Appellee will also have the same approximately 10 minutes to present oral argument. And then after that uninterrupted presentation, the justices will ask questions. Now, I want to have the lawyers that are actually going to present identify themselves, but I have a question. There was a joint brief filed. It is our suggestion that one attorney, since only one brief was filed, that one attorney will present. So who is going to present and is there any objection to that procedure this morning? I don't think you gave yourselves approximately multiple time periods to all address the court. Your Honor, I can address that. This is Edward Tafe on behalf of Appellee Continental Casualty Company. I will make the presentation on behalf of the insurers. I was going to reserve a little bit of time at the end for other insurer counsel if they had anything to add. But if that's your Honor's preference that I do it solely, that is fine. Yeah, I think that that may pose some difficulty unless you want to stop halfway through. But my suggestion is there was one brief and that Mr. Tafe, you should proceed. If there is some vigorous objection after your presentation, perhaps we'll consider allowing someone else to present. So I would now ask who is going to be arguing for appellant? That would be me, Your Honor. My name is Evan Schwartz. Okay, good morning, Mr. Schwartz. And good morning to all of the attorneys that are here. And again, just so we are clear, is there any objection by the appellees to proceeding in the fashion that I have suggested where Mr. Tafe will present? No objection from QBE, Your Honor. Thank you. Could I hear from the others? No objection from Ace and Illinois Union. Is there another attorney? Just myself, Your Honor. I'm also an attorney for Continental Casualty. So no objection. All right. Well, thank you. That will make things much easier. All right. The time now is 9.52. Mr. Schwartz, you're going to have about 10 minutes uninterrupted time. However, you should, if you wish, save some time from that 10 minutes for your rebuttal. Do you wish to do that? Yes, Your Honor. Two minutes for rebuttal, if I may. All right. Maybe I should. I should probably set a clock, no? No, no, don't worry about it. I'll let you know about a minute before, after you've maybe used up eight or nine minutes. You know, we don't cut people off. We do have other proceedings. And so we are under certain time constraints. But I believe we'll have plenty of time to get through this appeal and have enough time for everyone to have their presentation. So with that, it's now 9.53. Mr. Schwartz, please proceed. Good morning, Ma'am. Please record. Again, my name is Evan Schwartz. I am the attorney for the appellant. I want to start just by reviewing a little bit. You know, we're dealing with an appeal from a judgment on the pleadings in the context  of the duty to defend. This has been amply briefed. But I will say just a couple of things about the well-established case law on the issues of duty to defend, including that courts are to focus on the factual allegations contained in the underlying complaints, not the legal theories postulated by attorneys that drafted the complaints. It is a liberal construction of the underlying pleadings in favor of the insured. And any doubts and ambiguities are to be resolved in the insured's favor. And you only need one theory out of any theories pleaded in the complaint to create coverage or create a minimum of the duty to defend, whether or not there are some uncovered claims. If there's one covered claim, then there's a duty to defend all of the claims. And the facts of the complaint just need to potentially bring the claims potentially within coverage. Here, on the issue of accident, I just want to reemphasize that I believe this is also settled law, that we're talking about accidental means has been defined as not the intentional act of the insured, but whether or not the result was expected or intended from the standpoint of the insured, meaning plenty of things are intentional acts in the world. We all do things with intention. We drive our car on the road. We intend to go out in our car. We intend to do things. But it's not that the act itself was intentional. It's that the result from some other unforeseen circumstance renders an unexpected or unintended outcome from the insured's standpoint, not the natural and probable consequence from the insured's standpoint. And I'd last want to say that the word occurrence is actually under Illinois law broadened the term accident to provide for greater coverage. And it's in that context, the duty to defend and the question of what is an accident, what is not an accident that we present here that 401 North, we postulate clearly has established its entitlement to a duty to defend. They intentionally created a cooling water intake system and an HVA system to withdraw water from the native rivers of the Chicago River to put through its HVA system. OK, there's no question they intentionally did that. There's no question that they had received permits to do that. And it had been permitted twice, once in 2005, once in 2012. And a draft permit with the same terms and conditions was also issued in 2018 before ultimately the state and then two other plaintiffs, that being the Sierra Club and the Friends of the Chicago River, brought actions against 401 North, alleging that they were not in compliance because the claim is that now their cooling water intake system is a new source, not an existing source, as it was originally permitted in 2005, 2012, and preliminarily in 2018. So, yes, 401 North intended to operate that system, but it did not intend to create any damage to the environment. Indeed, it was permitted by the state and the studies that the state ordinarily requires were not continually required. So there was no belief on 401 North's part, nor did it expect or intend that it was going to harm aquatic life as a result of the cooling water intake system. So the harm alleged in the pleadings below, and specifically the Sierra Club complaint and the Friends of the Chicago River complaint in its public nuisance count, specifies that there are damages to the aquatic environment as a result of the cooling water intake system, were not expected or intended from 401 North's standpoint. They thought they were operating under a perfectly valid permit that had been issued twice and preliminarily issued again. And so for the court below to have decided in this context that there was no duty to defend and there wasn't a reasonable possibility that 401 North did not expect or intend to be sued for, A, no longer having a permit that was previously valid, and B, causing this harm to the environment as a result, I believe and we believe under the case law is a classic example of neither expected nor intended from 401 North's perspective. There are two other issues specifically presented. One is whether or not there is property damage alleged in the underlying complaints. And we respectfully submit that the, and this is also very well briefed, but that the Bible Pork Country Mutual Insurance versus Bible Pork case that's been cited throughout all of the briefs controls. And the Bible Pork case, believe it or not, was a public nuisance case, wherein the court held as a matter of Illinois law that pleading a claim for, even in pleading a claim for further and different relief or other appropriate relief in a complaint is enough to trigger the duty to defend and the possibility of damages being recovered. So here, not only do we have the Sierra Club complaints specifically alleging specific damages to the environment and to the aquatic life, but both complaints allege the further and different relief and both the complaints seek injunctive relief, all of which the Bible Pork case says constitutes property damage. Because even a suit that is seeking injunctive relief, the money that will need to be spent to comply with the injunction can very well be deemed to be damages according to the court in Bible Pork. So even though the property damage issue was not addressed by the court below, in order to, in order for 401 North to get its defense, it has to establish that the complaint alleges an occurrence that caused property damage within the meaning of the policy. The final issue that's briefed before the court is the issue of the pollution exclusion. And we would respectfully submit that drawing in native river water from the Chicago River is not a pollutant within the meaning of the policy. So, and there's no case law to support that this pollution exclusion would somehow have a greater application to something that's not a pollutant for any particular reason. And indeed, case law requires that exclusions be interpreted narrowly. There's no definition within the pollution exclusion that could ever even suggest that the native Chicago River water being drawn into the cooling water intake system that has resulted in this litigation is somehow a pollutant within the meaning of the policy. And for all of those reasons, we believe that the circuit court erred and that at a very minimum, 401 North should be provided with the duty to defend that it was receiving prior to this court, the court below's ruling until perhaps there's an outcome in discovery or the underlying case to determine whether there actually is an indemnity obligation. And that is all I have for your honors. All right. Justice Walker, do you have any questions at this time? No questions. Justice Reyes. Yes, I have a couple of questions. Counsel, it seems like you're focusing or putting as part of your argument, the impact on the aquatic life, but aren't both of the underlying complaints really based on operating without a permit? Well, there are accounts that are saying you failed to timely seek renewal of a permit, but count two in each complaint specifically alleges that the entire system is not operating properly as a result. So the public nuisance count in the Sierra Club complaint and the count in the state complaint for violation of the permit conditions is not just saying you were operating without a permit because the underlying complaints allege that 401 North didn't timely seek renewal of its permit within a certain amount of time. And those are definitely just based on, hey, you didn't timely seek to renew your permit. And that's not what we are arguing now creates the basis for the duty to defend. It's count two in both complaints. They're saying even if you had timely sought a permit, you now have a new source and you didn't do all the studies you were supposed to do and you're in violation and we want an injunction and we want damages to the aquatic environment, everything else. Okay. So I have another question with regards to the permit. How can the decision to operate the cooling system without a permit be considered accidental? Again, it's not accidental. Operating the system itself is not an accident. It's what's alleged in the complaint. Well, first, let me say, Your Honor, my client, 401 North, was operating with a valid permit and thought it was operating with a valid permit. The timeliness issue aside, the state decided in 2018 after conferring with the EPA that suddenly this cooling water intake system, which had been permitted as legal and proper three times in a row, even a third time just being the preliminary permit, was suddenly not legal anymore and brought an action. So how was my client had no idea that they were going now to say what they as experts had deemed to be proper and legal was suddenly not legal anymore? But the decision to operate a cooling water intake system, the decision to have an HVAC system is clearly intentional. But the case law is that it's not the intentional act. It's the unexpected and unforeseen thing that happened as a result of doing something intentional that creates an accident under these policies. And that's why I was saying and the case law that we cite in there is very, very clear. Everybody acts intentionally to do something which leads to an accident. So even the classic Supreme Court case, which the Yates decision ultimately adopted as the law of Illinois, involved three men who decided to jump from one level to another. Two guys jumped. They were fine. The third guy jumped. He threw out his back and suffered a horrible injury. And then he made a claim. And they said that was an unexpected result of his decision to jump. Right? So statutory violations involving permits or other things, it's not a question of whether or not they intended to operate. They intended to operate with a permit. It's whether or not the harm resulting from what's being alleged in the underlying complaints is something that was unexpected or unintended from 401 North's standpoint. And we submit that it is. Well, what was the basis for the need for the new permit? A new former type of permit? You have to renew it every period of years. It's just required by law. You have to renew a permit. To have a cooling water intake system in the river, you have to be permitted. Right? So their first permit was 05. Then they had to get a renewal permit in 12. And then their permit was expiring. And they had to apply for renewal again in 2018. Right. But I thought I understood you to say that the permit itself or what the permit covered or the type of operation had changed in 2018. That's why you needed a new permit. No, no, no, no. Anybody that has a permit in the river like that has to get permission to continue to operate it every, I guess it's every maybe six, seven years. But they applied for the renewal of the permit. And they actually got a preliminary permit because they were required to. Their permit was just expiring as a matter of time. But rather than issue the new permit after the state issued the preliminary permit, the state decided, wait a minute. We decided that this facility was not operating legally from the time we gave it permits in 2005 and 2012. And therefore, we're not going to give them a new permit. And then they brought the lawsuit. So they sought a new permit because they're just required to. They're required to have a permit every couple of years. But the permit wasn't issued because the state believed that now retroactively the system wasn't operating legally. Got it. Okay. Thank you. No further questions. Thank you. Mr. Schwartz, as far as this pollutant exclusion, I'm not sure I understand your argument, but the exclusion also includes that there be property damage, right? No, property damage is a requirement of coverage under the policy. It's not part. Right. But what does the pollutant exclusion say? It excludes damages caused by pollutants and contaminants. Don't those damages have to be property damage? Yes. Okay. So one of the claims of your opposing counsel is that there is no property damage here. Setting that aside, explain to me, how is it? I'm not sure I understand your argument. That because the acts of taking in the water are not polluting, but at the same time, the allegations are that what is being put back is that somehow the exclusion doesn't apply. I don't quite understand your reasoning. Okay. So the pollution exclusion talks about contaminants, thermal irritants, pollution, all kinds of things. Right. I get all that. And the law defines heated effluent, the water that's recycled through the HVAC system and is warmer than it was when it was taken in. That is defined as a pollutant under the Clean Water Act. So you're conceding that what you put back in is a pollutant. Correct. Okay. I understand. But you're also suggesting that since when you take it in, that's not a pollutant, that the exclusion doesn't apply under these facts. I don't understand what your argument is. So the argument is that the clean water of the Chicago River is by definition not a pollutant. Yes. The system takes in the clean water and withdraws it. Billions of gallons of water into the HVAC system, recycles it, and then sends it out as heated water. The allegations that the state are making in counts two and the friends of Chicago River and the Sierra Club in both their complaints are specifically directed only to the cooling water intake system. Okay. All right. So that those counts, in any event, according to you, would not come under the exclusion. Correct. We wouldn't be here if it was just the discharge of the thermal heated water. But you do agree you have to show damages and that you have done that. Yes, yes. And that you've shown property damage. Correct. Now, you would agree that the damage to the river itself, as far as the fish, no one owns that. Is that true? That's true. Well, it is. It's owned by the public. Not by the parties to the lawsuit. Correct. The complaint is fashioned in terms of injunctive and declaratory relief, true? Primarily, yes. And your sole case you're relying on for claiming that there's property damage is the Bible pig, pork rather, excuse me. Well, we've cited a few other cases in the brief, but the Bible pork case is the one that's really, really on point with this analysis. And your opponents don't agree. So what do you say to the argument that they made that it doesn't apply? I think it's incorrect. Okay. I think they're mistaken. All right. I don't have any further questions at this time. I just have a follow up question. So if I understand correctly, what you're saying is, well, let me phrase it this way. Aren't the intake and the discharge of the water two sides of the same coin? So if you consider one a pollutant, shouldn't we consider both as pollutants? If for some reason it was treated that way in the lawsuit, that would be a possibility. But that's not how it's treated. And it is two separate acts. In order for the system to operate, the first thing that needs to be done is the water needs to be drawn into the system. And that in and of itself is reticulated and regulated by the government and the subject of very specific counts in the complaint. The second part is the discharge of the heated effluent. And that's subject to a whole nother set of regulations within the Clean Water Act about how high is the temperature? What impact will that have on the environment? There are a whole series of separate regulations. So respectfully, I would suggest that that's not how it should be treated. And that's why we believe that these two counts in the complaint are separate and independent counts focused entirely on the intake system, not the discharge system. Thank you. No further questions. Thank you, Your Honor. And you're saying that those... Oh, I'm sorry. Justice Walker, please proceed. Yes, I am still confused, Mr. Schwartz. You're trying to use accident. You're saying it's not an accident that we took the water in, but that there's an unforeseen result and that that constitutes the accident. But you've been taking the water in and shoving the water out since, you say, 2005. So what was unforeseen about the result? It's the allegations of the harm to aquatic life that were unexpected and unforeseen by 401 North. And that's part of this new allegation contained in counts two of both complaints, that suddenly their system, which was operating legally and permitted under the environmental law, is suddenly deemed by the same entity to not be legal. And the studies that are... Now they're saying we're supposed to study all of this now, when before they weren't requiring us to study it, because they're saying that our pooling water intake system is a new source, no longer an existing source. Even though it was deemed to be an existing source in the 2005 permit, so studies weren't necessary, and the 2012 permit, so additional studies weren't necessary. Suddenly now, it's like start over with your existing system that we deemed to be legal since 2005. We're now saying you have to do all this over. 401 North did not expect or intend that harm. And that is the... And again, when you look at the case law, some of these cases are classic examples. There's examples of a gentleman who walks into a room and somebody shoves him and he falls and hits his head. Well, if you shove someone and they fall out back out the door, it's a possibility that they're going to get hurt. If you intentionally jump, there's a possibility you can hurt. If you drive a car, but you like to drive it quickly, even if you don't, you may drive too fast and cause an accident. Does that mean you're not going to get coverage under your liability policy because you should have expected or intended you were getting an accident because you were speeding? No, always covered. Same thing. Yes, we intentionally operated the system. We got a permit, but we didn't expect for the government to come in and say, the permit that we've given you all these years is suddenly now no longer legal and you have to do all these studies because you're causing potential harm to the aquatic environment. Forget about the studies. Are you actually saying that taking in approximately, what was it? Two million gallons of water? Is that... Am I correct? Yes, one point, yes. That taking in 1.9 million gallons of water in the intake cooling, that there would be no expectation of pulling in fish and aquatic life? Is that a question of fact? Again, what we're talking about is the legality of the permit. Let's go back to your use of the word legality. Are you saying now that the legality of being given a permit would then preclude anything being expected or intended by the insured? No, no, it doesn't. And there isn't any case that even suggests that, is there? No, it's just a legion of cases that say when there's an unexpected result and everybody does things with intention and there's a risk that... And you're saying that there's absolutely multiple questions that when you took in the two million gallons, you didn't expect anything just because you had a permit or because you're saying now it was legal. I'm not sure there's cases that use your terminology that you're introducing here. I thought that the definition of occurrence is slightly refined by accident, but now you're giving a permit that suddenly that's part of the traditional case law interpreting occurrence and accident? No, no, no, not at all. Okay, I would hope not. I'm not. What I'm saying is the context of the facts of this case are what create the unexpected and unintended outcome for 401 North. I'm not saying that... The law is very well settled and there's legions of cases where people perform intentional acts with outcomes that they didn't expect or intend. Right, and I guess I'll go back to my question. Drawing in two million gallons of water every day for years and years, that that could never or isn't really that there'd be an expected consequence of damage to aquatic life? I'm not saying that there isn't a possibility that would have occurred from drawing in the water, but what I'm saying in the context of insurance law is the expected or intended outcome, you know, in anything that anybody does when they... There's cases where... You're saying this is an accident. It's the accident. Bringing in the two million gallons is an accident. The definition, it fits within the definition for insurance recovery purposes of an accident and the case law in Illinois is legion of examples of things that people do where you would sit there and say, well, you know, that's probably... That could happen. Well, yeah, it could happen, but it doesn't mean it was expected or intended. What was expected or intended was they were going to operate the system. The outcome here that's alleged in these complaints was not expected or intended by 401 North. Okay. Anything further at this time? All right. So then we're going to hear from Mr. Tafe, please. You may begin. Yes. Good morning, Your Honors. Edward Tafe on behalf of Continental Casualty Company, Appali. I'll start with the issue of what an occurrence is because that's where we left off and it is the first issue in our briefing as well. An accident is defined under Illinois law as an unforeseen occurrence, usually of an untoward or disastrous character or an undesigned, sudden or unexpected event of inflictive or unfortunate character. Now, the cases go on to discuss this issue of the natural and probable results of an insurance ax, and those are not deemed to be accidental. Now, here we have not only, as the circuit court found, the operation of an HVAC system just being on its face intended to cause the result that is alleged in the underlying action in both the state and the intervenors' complaints, but we've also got the federal and state regulations that cooling water and intake structures operate under. So, this is aside from the fact that the state alleges that proper permitting wasn't accomplished by 401 North Wabash, but the intake system itself is regulated and in the intervenors' complaint and the underlying complaint at paragraphs 31, 40, and 52, they cite to the Illinois regulation 306.201, and that is about intake structures. And it says, new water intake structures on waters designated for general use, whose construction begins after the effective date of this chapter, which is in 1983 is when it was enacted, must be designed to minimize harm to fish and other aquatic organisms. Likewise, in the state's complaint against 401 North Wabash, they cite to federal regulations and the Code of Federal Regulations 401.11 is cited in the state's complaint. Well, 401.14 of the same regulations, which addresses cooling water intake structures, says that they have to be operated so as to reflect the best technology available for minimizing adverse environmental impact. So, everybody operating one of these systems knows that it has adverse environmental consequences and may harm fish and other aquatic organisms. So, that is the starting point. And the natural and probable results of anyone operating one of these systems is that there can be harm to aquatic life or environmental harm. And I'm glad to hear that there's no dispute about the effluent itself being a pollutant, because when the water goes into the system, it goes into the HVAC system, and when it's released at a different temperature, that is considered, under federal and state law, a pollutant. And I understand from Council's remarks that there's no dispute, at least about that part. Now, that is significant, and I'll get to that when we get to the pollution exclusion issue, issue number three. But, in terms of just the occurrence, here, the effects of running the HVAC system is the same, it's one in the same, as the harm that is alleged. So, the state is saying you're operating this HVAC system, and you shouldn't be because the permits aren't right, et cetera. So, but that part of it is not determinative, although it is important to know that the 401 North Wabash subjectively was operating this system as it intended to do, under the permits that it had sought and obtained. So, it intended every step of the way, every act it engaged in, and all the results. So, that, under Illinois law, is not an occurrence. And this is sort of related to the issue of whether there's any potential property damage. And since the case law was raised on that issue, Bible Cork, and another one is called Imperial Marble, and what both of those cases deal with, one is from the fifth district and the other is from the third, what both of those cases deal with is claims by injured neighboring property owners who have experienced damage from a nuisance caused by, in the case of Bible Cork, Cork operation, and in the case of Imperial Marble, another industrial operation. But there's a nuisance happening, and the neighbors complain. Now, that is a different case. Here, the issue, here it would be if somewhere downstream, the Smiths had a garden and the sue for damages for recovery of that loss. Now, there would be an argument, certainly under Bible Cork and Imperial Marble, although I don't agree with everything that is in those decisions, there would be an argument that that could be property damage caused by an occurrence, because the discharger, in that case, would say, we intended everything, we intended all the acts that are inherent in the HVAC system itself, but we didn't know we were going to harm somebody's garden downstream. Okay, that would be one case, and that is what Imperial Marble and Bible Cork are. They're those kinds of cases, neighbors complaining about damage to their persons and caused by an industrial operation. But here, the state is simply saying, you're doing this, and you ought not to be doing this. And the regulations, both state and federal, are clear about why they exist and why the HVAC system was operating under regulations at all. It was operating under those regulations, whether they were complied with or not by 401 North Wabash, they were operating under those regulations because those regulations require the minimization of adverse environmental impact and also minimizing harm to fish and other organisms, other aquatic organisms. So, the best cases for whether there's property damage are, they're not Bible Cork and Imperial Marble, they are cited at page 23 of Appley's response brief. And what those cases deal with, one is called Crawford, another is called HPF, and another is called bituminous casualty. And the upshot of all those cases, Your Honors, is simply that just an allegation about harm to property is not the main focus. It's whether the underlying claimants are seeking recovery damages for bodily injury or property damage. And here, that's just not the case. It's certainly not the case with the state. And my understanding from the comments of counsel is that they're focused on the intervenors' allegations about harm to aquatic life. And I would simply say that the whole regulatory regime about water intake and cooling systems, as well as just common sense, and then more subjectively, the whole history of 401 North Wabash taking this water in since the early 2000s up until the present, all speaks to the fact that everything that happened was a natural and probable result. And we cited the cases in our brief that when it's the natural and probable consequences of an act, that is not an occurrence defined as an accident. That was the definition I gave at the outset of my remarks. Anything further before we begin our questioning? Very, very briefly, I'd like to say, Your Honor, because I don't want to forget about the pollution exclusion. Because the pollution exclusion applies broadly. And it's quoted at page 27 of our brief. And it says that the property damage is excluded under the pollution exclusion for bodily injury or property damage, which would not have occurred in whole or in part, but for the actual alleged threatened discharge, dispersal, seepage, migration, release or escape of pollutants at any time. Well, it's undisputed that the effluent, at least, is a pollutant. Whether it's a pollutant already when it comes into the system. I mean, I think I would say that as soon as it enters their system, it's a pollutant. Because it's not part of the river, the natural river ecosystem at that point. So everything they're doing, everything 401 North Wabash is doing, falls within that definition. It all was in whole or in part caused by their polluting activity. And secondly, the pollution exclusion applies to any loss, cost or expense arising out of a request, demand or order that the insurer tests for, et cetera, pollutants. And that clearly is what's at issue here. So those would be my remarks, Your Honor. If you have any questions, I'd be happy to answer them. All right. We will proceed then with questions. Justice Walker, do you have questions? No questions. Thank you. Justice Reyes. Okay, Counsel. Based on your argument and determining whether this was accidental, should we be looking only at operation without a permit or should we be looking at the effects of the operation? We've cited the authorities, Your Honor, that speak to both issues. So case law deals with the idea that failing to properly permit something is not itself an accident. And I would certainly commend that to the court, that nothing 401 North Wabash did in terms of getting a permit, failing to get a permit, renewing a permit, whatever it was, none of that was accidental. That was all volitional, intentional, doesn't fall within the definition of an accident. But the operation of the HVAC system itself, both the intake and the outflow, those are both the natural and probable results of what they're doing. So it would be a slightly different analysis, Your Honor, because the permitting issue doesn't get so much into whether it's the natural probable result. It's just not an occurrence. You're getting the permits that you want. That's it. So, but the natural and probable consequences of operating the HVAC system itself, those cases would just deal with the fact that every act taken by the insured was intentional and the result was expected and intended. Or at least another way to say it is the natural and probable consequences of those acts. So slightly different analysis for the permitting versus the actual operation of the HVAC system itself, but neither one is an occurrence. Okay. So if I understand counsel's argument, it appears that if the building had not performed studies about the impact on the aquatic life, how can they be expected to know what the water intake would do or what impact it would have on them? So, Your Honor, I would say that that's getting too granular about what constitutes an occurrence. Whether they did the study or not, if they were supposed to do a study and didn't do it, that's not an occurrence. If by not doing the study, they're saying that they didn't know the effect of their HVAC system on the environment. Well, I would say that that's just simply implausible. The regulations themselves talk about the adverse impact to the environment. That before you ever do a study, the regulations themselves that require them to operate an HVAC system in a certain way and get any regulation at all, exists so that they can minimize harm to fish and other aquatic organisms and also minimize other environmental impact. Okay. And just one more question on the intake. The policy seemed to focus on the discharge of contaminants into the environment, not removing something from the environment. So, how can the intake of water be considered a pollutant under the policies? Yes, Your Honor. The intake, the operation itself, taking in the water and then discharging it, is obviously a polluting activity, per se. I think there's no dispute about that, that taking water into the HVAC system and discharging it at a higher temperature that you are polluting. You might be doing it pursuant to your permit, but you definitely are polluting. But then the intake is a little different analysis because there I would point to the broad language of the exclusion itself, which is to say that it applies with respect to property damage that would not have occurred in whole or in part, but for the pollution. And the HVAC, nothing in the intake system would have occurred in whole or in part, but for the effluent. So, that's one way of looking at it. Another way of looking at it is that even if that small piece of the puzzle, the intake water, was not itself a pollutant, that that part of the, we go back one step in the analysis to the property damage. So, then it doesn't have to be within the pollution exclusion because it's not a property damage. And the pollution exclusion is there to exclude property damage that might have been covered otherwise. And this would not be property damage that would be covered otherwise because the underlying plaintiffs and intervenors are not seeking damages to recover for that property. So, and then of course, you continue the analysis to the occurrence and the occurrence issue is also germane to the intake part of this. But that's the best way I think to analyze the pollution part of this. Anything further, Justice Reyes? No, nothing further. All right. And I have no questions. Mr. Schwartz, we're going to give you about a minute for your rebuttal. You may proceed. Thank you, Your Honor. Just ending with the last point. When you look at the pollution exclusion, it all surrounds the question of, is there a pollutant? And a pollutant is a defined term as to what it is. So everything that occurs in this exclusion is what is a pollutant. And the pollutant is a defined term. And it's unquestionable that the native Chicago river water is not a pollutant. So I would just respectfully suggest that you can't say that the separate act of taking in the water from the river is a polluting activity. It's not a polluting activity. It's a regulated activity. But it's not a polluting activity. And it's not a pollutant. So that's number one. And I say that again against the backdrop of exclusions are to be strictly construed against insurers. And they have a burden to show that the conduct alleged in the underlying complaint falls solely within and entirely within the exclusion in order for it to apply. On the occurrence issue, I would just suggest to the court respectfully to look at pages 14 to 16 of our opening brief, where we cite Illinois case law, which is legion, even when someone's operating with a permit, when they are engaging in activities, which clearly could cause harm. The fact that it could cause harm does not mean that is expected or intended from the standpoint of the insured or a probable or natural consequence of an act. An act of withdrawing river water into an HVAC system. So it may seem counterintuitive, but that is why the law protects the duty to defend in particular on the question of whether there's an occurrence and why it's broadly construed. Because litigation insurance in these liability contexts is broadly construed to protect people, to get the insurance company, to hire them a lawyer, to defend them. And that's why the public policy of the law is to broadly construe these things that all acts done with intent does not mean that the outcome was intentional from the standpoint of the insured. And I would respectfully argue that this is a clear case where it was not expected or intended from 401 North standpoint. And I have nothing further. Any other questions by the panel members? No, no questions. All right. Thank you, counsel for both sides. The case was well-argued and well-briefed. It will be taken under advisement. And this concludes the oral argument on this matter.